

James Cheung
1107 Fair Oaks Avenue, Suite 110,
South Pasadena, California  91030
Telephone: (626) 262-1211
Email: JamesDiamondBar@gmail.com

Plaintiff In Pro Se

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

**JAMES CHEUNG**, an individual;

    Plaintiff,

vs.

**SOUTH PASADENA**, a California Municipality;  **DAVID G. WATKINS,** as an individual and in his official capacity as Community Development Director; **ANGELICA FRAUSTO-LUPO,** as an individual and in her official capacity as Community Development Director; **DOES ONE** through **TEN,** inclusive;

    Defendants

Case No.:

**22-1756-SVW-GJS**

# CIVIL RIGHTS COMPLAINT

**CONSPIRACY TO VIOLATE CIVIL RIGHTS**
**&**
**VIOLATION OF CIVIL RIGHTS**
**(42 USC 1983 & 42 USC 1985)**

**SEEKING DECLARATORY & INJUNCTIVE TO VITIATE HAZARDOUS PERMITS ENDANGERING PLAINTIFF AND VIOLATING THE PUBLIC TRUST ISSUED BY DEFENDANTS ILLEGALLY BASED UPON UNCONSTITUTIONAL PLANNING ORDINANCES, CUSTOMS, POLICIES AND PRACTICES THAT VIOLATE PLAINTIFF'S CONSTITUTIONAL RIGHTS OF DUE PROCESS & EQUAL PROTECTION SECURED TO THE PLAINTIFF BY THE FIFTH & FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION AND IN VIOLATION OF 42 USC 1983 & 42 USC 1985**

**DEMAND FOR JURY TRIAL**

-1-

Complaint for Declaratory & Injunctive Relief based on 42 USC 1983 & 42 USC 1985

## COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF

1.      The Plaintiff, in Pro Se, on behalf of himself, states as follows and complains against

Defendants and for claims for relief allege:

## JURISDICTION & VENUE

2.      This Court has jurisdiction under 42 USC 1983 and 42 USC 1985.

## PARTIES AND RELATIONSHIPS

3.      Plaintiff, **JAMES CHEUNG** (hereinafter **"CHEUNG"**), is a resident of the City of

South Pasadena, County of Los Angeles, State of California, of Chinese descent.

4.      Defendant **SOUTH PASADENA**  (hereinafter **"SOUTH PASADENA"**) is a California

Municipality located in the County of Los Angeles, State of California.

5.      Defendant **DAVID G. WATKINS**  (hereinafter **"COMMUNITY DEVELOPMENT**

**DIRECTOR WATKINS"**) as an individual and also as a Public Official employed by the City of

South Pasadena as Community Development Director, who oversees and directs the customs and

policies and practices of the Ordinances enacted by the **SOUTH PASADENA** as well as

overseeing and directing the issuance and approval of Permits and issues regarding Code

Compliance.

6.      Defendant **ANGELICA FRAUSTO-LUPO** (hereinafter **"COMMUNITY**

**DEVELOPMENT DIRECTOR FRAUSTO-LUPO"**) as an individual and also as a Public

Official employed by the City of South Pasadena as Community Development Director who

oversees and directs the customs and policies and practices of the Ordinances enacted by the

-2-

**SOUTH PASADENA** as well as overseeing and directing the issuance and approval of Permits and issues regarding Code Compliance.

7.      The true names and capacities, whether individual, corporate, associate or otherwise, of Defendants, named **DOES 1** through **10,** are unknown to Plaintiff who therefore sue said Defendants by such fictitious names, and Plaintiff will amend this Complaint to show their true names and capacities when the same have been ascertained. Plaintiff is informed and believes and thereon alleges that each of the Defendants designated herein as a **DOE** was in some manner legally responsible for the events and occurrences herein alleged and unlawfully and proximately caused damages to Plaintiff.

8.      At all times herein mentioned, each of the Defendants was the servant, agent, joint venturer and/or employee of each of the remaining Defendants, and was at all times material hereto, acting within the course and scope of their position, service, agency, venture and/or employment. Additionally each of the Defendants ratified, approved and adopted the conduct of the other Defendants.

9.      Plaintiff is informed and believes, and based thereon alleges, that the Defendants, and each of them, had knowledge of, joined in the formation of, and participated in and/or aided and abetted in a conspiracy to violate Plaintiff's civil rights in violation of 42 USC 1983 and 42 USC 1985 with each of the other Defendants by committing the acts and omissions alleged herein, and that said acts and omissions were committed in furtherance of a conspiracy to violate the civil rights Plaintiff resulting in Plaintiff's request for equitable remedies and damages as set forth herein.

10.      The events, transactions, and occurrences that form the basis of this Complaint transpired or were entered into in the State of California.

Complaint for Declaratory & Injunctive Relief based on 42 USC 1983 & 42 USC 1985

## GENERAL ALLEGATIONS  & SUMMARY OF PLAINTIFF'S CLAIMS

11.    Plaintiff **CHEUNG** is filing this Civil Rights Complaint based upon Defendant's Conspiracy to Violate Civil Rights and Violation of Civil Rights pursuant to 42 USC 1983 & 42 USC 1985.   The Complaint seeks Declaratory and Injunctive Relief seeking to vitiate hazardous permits endangering Plaintiff issued by Defendants illegally based upon unconstitutional planning ordinances, customs, policies and practices.   Specifically, **SOUTH PASADENA** and its appointed officials have conspired to issue illegally a hazardous permit that endangers the Plaintiff and his family and violates the public trust and Plaintiff's Due Process Rights and Equal Protection Rights secured to the Plaintiff by the Fifth and Fourteenth Amendments to the United States Constitution.

## BACKGROUND INFORMATION

12.    There is no way imaginable when the Developers conceived of a project in the early 1960's in a region of **SOUTH PASADENA** named "Altos de Monterey" that they envisioned that the spacious lots they created would result in a conflict between two (2) adjacent residences that reveal the yarn that would unravel the **SOUTH PASADENA'S** ongoing Planning scheme regarding hillsides in the **SOUTH PASADENA,**  in which Permits would be issued pursuant to a set of Ordinances, customs, policies and practices which were governed by no ascertainable standards but rather were governed and directed by the "opinions" of the City Staff and then memorialized into Staff Reports that were fed like poisonous sugar pills to members of the Planning Commission and the City Council, with those Staff Reports recommending mostly "Approval" with no regard to whether or not the Project conformed with the applicable laws and often turning a 'blind eye" to the rights of adjacent neighbors, many of who were busy "Angelenos" who did not have time to scrutinize the origin of planning approvals and permits but rather just "trusted" **SOUTH PASADENA** to "do the right thing and follow the law".

13.     But **SOUTH PASADENA** is not an ordinary city but in fact is a charming glittering community, situated only six (6) miles from downtown Los Angeles.  Often referred to as "The City of Trees" (See **Exhibit 1** attached hereto and incorporated herein by this reference),  the area is known for its stunning homes, unique small businesses, and top quality schools with its diverse population of about 25,000 occupying a mere 3.44 square miles of flatlands and hillsides on the west side of the San Gabriel Valley. Officially incorporated on March 2, 1888 with a population of slightly over 500, **SOUTH PASADENA** also has a strong claim to having the oldest and most historic sites in the San Gabriel Valley.  In fact for many centuries, **SOUTH PASADENA'S** adjacency to a natural fording place along the Arroyo Seco had served as a gateway to travel and commerce for aboriginal peoples here and along the coast.  And it was in South Pasadena that the Chief Hahamogna (the Chief of the Hahamogna Indians, the original settlers of the region) greeted Gaspar de Portola (a Spanish Military Leader who later became the first Governor of California) and the missionaries who later established the San Gabriel Mission a few miles to the west. **SOUTH PASADENA** eventually emerged as one of the first suburbs of Los Angeles, and now is considered to be one of the best-preserved cities, maintaining a small-town quality and humanity in the scale of its buildings, its residential streetscapes and historic commercial core.

14.     With such a rich and vivid historical backdrop serving all at once as a sword and a shield, it is easy to understand how **SOUTH PASADENA** eventually attracted leading Planning Professionals who occupied positions of leadership and power that enabled them to reduce the actual application of the laws to the facts to mere expressions of their opinion, with no regard for whether **SOUTH PASADENA**'s Planning related Ordinances, customs, policies and practices were implemented in a fair and consistent manner but rather were implemented based upon the whims and arbitrary and capricious decisions of the lead Planning Officials, who engaged in a series of independent actions creating approvals that violated the specific letter of the planning ordinances and in the process violated the due process and equal protection rights of many of the citizens of **SOUTH PASADENA**, who suffered silently as they watch natural hillsides get pillaged and plundered by their neighbors, with the hillsides in neighborhood often looking like scoops of ice

cream have been removed from the hillsides, with residences forcing backyard improvements into lots that were envisioned by the developers of never losing their natural slopes.

15.    And as the real estate values exploded in **SOUTH PASADENA**, more affluent residents flocked to the neighborhood, often plunking down several million dollars for a lot and a large home, often rapaciously looking to improve that home and the lot at all costs, including losing the natural terrain in the backyard.

16.    In fact, it was a not-so-well-kept-secret that Defendant **COMMUNITY DEVELOPMENT DIRECTOR WATKINS,** the predecessor of Defendant **COMMUNITY DEVELOP DIRECTOR FRAUSTO-LUPO,** had a penchant for ignoring the planning laws and doing whatever he wanted to do, in the process conditioning the Planning Staff to rely predominantly on his discretion as opposed to following the law.  And as time progress the Ordinances morphed into non-existent rules and regulations, only in effect as "window dressing" with the real gravamen of the decision making process resting in the sole discretion of **COMMUNITY DEVELOPMENT DIRECTOR WATKINS** who did what he wanted to do regardless of the laws.

17.    At one point, it became so out of control that **SOUTH PASADENA** passed an Ordinance that **Ex Post Facto** shored up the bad planning decisions by prior Planning Officials, with language that "laundered" the previous actions violating the Ordinances as well as the civil rights of other **SOUTH PASADENA** residents – and the passage of this "clean up" Ordinance was also a not-so-well-kept-secret.  In fact, the enactment by **SOUTH PASADENA** of this Ordinance was admitted to Plaintiff by at least one South Pasadena Planning City Official and it appears to be the general consensus of the staff at **SOUTH PASADENA** that this Ordinance indeed was enacted for that very purpose to clean up a series of mistakes made by previous Planning Officials, many of them made during the era of planning chaos and cronyism orchestrated by Defendant **COMMUNITY DEVELOPMENT DIRECTOR WATKINS,** which is also the time period in which the Applicant's Project was approved (2016) and during which Defendants trammeled Plaintiff's

Constitutional Rights of Due Process and Equal Protections in violation of 42 USC 1983 and 42 USC 1985 – and Defendant **COMMUNITY DEVELOPMENT DIRECTOR WATKINS** did **ABSOLUTELY NOTHING TO STOP THOSE VIOLATIVE ACTIONS BY DEFENDANTS**.

18.     And at the point quiet chaos in **SOUTH PASADENA**'S Planning Department was "silently roaring" Plaintiff learned that his neighbors were planning to construct a Project on their property. Plaintiff's residence and the neighbor's residence are each valued at approximately Two Million Dollars ($2,000,000) -- and they both have back yards which at the rear of each residence are predominantly hillsides. In each lot the hillside covers approximately one-third (1/3) of the backyard, having an average cross slope of approximately thirty (30) percent, which is steep enough to make you stumble head over heels down the hillside if you tripped at the crest of the hillside and steep enough to leave you breathless if you attempted to hike up the hillside briskly. Simply stated, the hillsides are unusable for anything other than aesthetic landscaping, and make it challenging to place an in ground pool in the back yard,

19.     Enter the Plaintiff, **JAMES CHEUNG**, who purchased his residence in the mid-1990's and raised his family in the residence, with his daughter matriculating across the street at Monterey Hills Elementary school, eventually graduating from South Pasadena High School, and now matriculating at University of California, Berkeley (and currently ranked in the top Five Percent (5%) academically). The Plaintiff is originally from Hong Kong with an undergraduate degree from University of Hawaii and obtained his MBA from the Marshall School of Business at University of Southern California, after that establishing a career in Real Estate Investing as well as a Computer Wholesale business in addition to investing in various Securities. So clearly, Plaintiff is thinking in a symphonic fashion about what has happened to his residence as well as what is happening in the City of South Pasadena and has blended his self-interested goals with altruistic goals aimed at seeking this Court's assistance in providing him with the Constitutional protections of Due Process and Equal Protection in a situation in which the Defendants have

–7–

ignored those Constitutional safeguards and issued Permits that are hazardous and do not follow any Planning Ordinances.

20.    Plaintiff's residence (hereinafter referred to as the "**CHEUNG RESIDENCE**") is commonly known as 1635 Via Del Rey, South Pasadena, California  91030, and more particularly described as follows:

> LOT 567 OF TRACT NO. 25588, IN THE CITY OF SOUTH PASADENA, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 713, PAGES 51 THROUGH 77 INCLUSIVE OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY

21.    The neighboring residence is owned by **EDMUND LOUIE**, an Executive and **DEBORAH KOTANI**, an Elementary School Principal.  That neighboring residence, hereinafter the **LOUIE/KOTANI RESIDENCE** is situated in Los Angeles County, known as 1627 Via Del Rey, South Pasadena, California  91030, and more particularly described as follows:

> LOT 566 OF TACT NO. 25588, AS PER MAP RECORDED IN BOOK 713, PAGES 51 TO 77 INCLUSIVE OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY

22.    The adjoining residences are located in a region commonly known as Altos de Monterey, which is a quiet residential community comprised of single family homes (approximately 3,000 square feet per home) predominantly constructed on large twelve thousand (12,000) square foot lots, with large front yards and backyards and side driveways that traverse from the street past the homes to garages at the back of each lot.   The subdivision was originally constructed in the 1960's, with Plaintiff's residence constructed in 1964, during the United States Presidency of Lyndon B. Johnson.

23.   The **LOUIE/KOTANI RESIDENCE** has some landscaping but most of the lot has been graded and scraped clean of any landscaping pending  construction of a large pool as well as other undisclosed amenities.   And this is the Project to which a series of illegal and hazardous permits were issued via a civil conspiracy by Defendants to violate Plaintiff's civil rights and a violation of Plaintiff's civil rights in violation of 42 USC 1983 and 42 USC 1985.

24.   Although Plaintiff **CHEUNG** was aware that major alterations were being proposed and implemented at the **LOUIE/KOTANI RESIDENCE,** Plaintiff **CHEUNG** as a citizen and resident of **SOUTH PASADENA** expected the Defendants to protect and preserve his due process and equal protection rights as it related to the permitting process regarding any proposed improvement and/or alterations to the **LOUIE/KOTANI RESIDENCE** that would affect his residential property.

25.   But such expectations and reliance by Plaintiff **CHEUNG** he soon discovered were misplaced as the Defendants then proceeded to approve a Project on the **LOUIE/KOTANI RESIDENCE** engaging in a Planning and Approval process that vividly trammeled Plaintiff **CHEUNG**'s civil rights and has endangered Plaintiff **CHEUNG** by creating a hazard condition on Plaintiff **CHEUNG'S** residential property based upon a Staff Report dated May 23, 2016 (hereinafter referred to as the "**2016 STAFF REPORT**"), a true and correct copy of which is attached hereto as **Exhibit 2** and incorporated herein by this reference.

26.   Realizing that the Project was rapidly being constructed and the beautiful centuries old natural hillside was being scooped like ice cream into trucks (may large trucks) and hauled away, Plaintiff approached **SOUTH PASADENA** to inquire about what he could do to deal with the increasing hazardous conditions arising from the Project.  For the most part, although treated cordially, Plaintiff was not able to obtain any probative information about the Project other than a few documents and Permits issued years after the 2016 Staff Report.

27.  At his wit's end, Plaintiff then contacted Ms. Evelyn Zneimer, the elected **SOUTH PASADENA CITY COUNCIL MEMBER** from Plaintiff's District and asked her to intervene. Initially Ms. Zneimer was very cooperative and communicative and seemingly supportive.  Then all of a sudden Ms. Zneimer abruptly turned about and punted the entire problem to **DEFENDANT COMMUNITY DEVELOPMENT DIRECTOR ANJELICA FRAUSTO-LUPO** in an email in which Ms. Zneimer wrote, in relevant part:

> Mr. Cheung,
>
> I referred your case to staff, specifically Director of Planning, Angelica Frausto-Lupo because this is a  staff matter.....**And whatever building permit that was previously and lawfully granted by staff cannot be changed** (Emphasis Added)

Plaintiff has attached hereto as **Exhibit 8**  true and correct copies of the email correspondence by and between him and Councilmember Zneimer (who is a licensed California attorney).

28.     After the matter was punted to the sole control of Defendant **COMMUNITY DEVELOPMENT DIRECTOR ANJELICA FRAUSTO-LUPO** any and all free flowing lines of communication regarding the Project were shut down and stifled (in the words of a Staff Member: "things were 'polarized") and it became challenging for Plaintiff to obtain even a counter meeting with his Planning Professional to evaluate any an all of the plans and records on file for the Project.  After reviewing those plans and records the entire communication stream between Plaintiff and Defendants has gone "radio silent" with Plaintiff twisting in the wind on the gallows next to a hazardous project that imperils him and his family and that he has no chance of stopping without the intervention of an outside authority such as this Court.

Complaint for Declaratory & Injunctive Relief based on 42 USC 1983 & 42 USC 1985

**THE PERMIT ISSUED PURSUANT TO THE 2016 STAFF REPORT ARE ISSUED BASED UPON A SET OF ORDINANCES THAT ARE VAGUE AND AMBIGUOUS WITHOUT ANY EVIDENT ASCERTAINABLE STANDARD AND ARE THUS UNCONSTITUIONAL ON THEIR FACE**

29.    The **2016 STAFF REPORT** is in the words of **SOUTH PASADENA**:

**A REQUEST FOR APPROVAL OF A HILLSIDE DEVELOPMENT PERMIT TO CREATE AN EVEN AREA FOR RECREATIONAL USE, CONSTRUCT A POOL, AND SURROUNDING RETAINING WALLS OF A DEVELOPED UPSLOPE LOT LOCATED AT 1627 VIA DEL REY.**

(See page 1 of **2016 STAFF REPORT**)

30.    The **2016 STAFF REPORT** describes the Project as follows:

Larry Laschner, from Dynamo Constructors, representing the homeowners submitted an application for removal of 350 cubic yards of dirt to create an even usable recreational space, construct a pool, and retaining walls surrounding the new area in the back yard of an existing house located on a hillside lot.

(See page 2 of **2016 STAFF REPORT**)

And

The Planning Commission will consider request for a Hillside Development Permit to construct a new pool and create flat outdoor recreational space by removing 350 cubic yards of the hillside in the backyard and constructing 6 foot high retaining walls surrounding the new usable outdoor space.

(See page 3 of **2016 STAFF REPORT**)

And

-11-

Complaint for Declaratory & Injunctive Relief based on 42 USC 1983 & 42 USC 1985

> The proposal includes a plan to excavate a portion of the backyard of an
> existing developed to allow for the creation of an even recreational space
> with a pool. Supporting retaining walls are proposed surrounding the new
> area. No design review is required for flat work; the conditions of approval
> simply require that stucco be applied to the concrete block retaining walls.

(See page 3 of 2016 <strong>STAFF REPORT</strong>)

31.    The **2016 STAFF REPORT** indicates that the Project is subjected to South Pasadena

Zoning Code requirements.  The first consideration is the application to the project of the Altos de

Monterey Overlay District, which adds additional restrictions to the South Pasadena Zoning Code,

which according to the **2016 STAFF REPORT** involves the application of **SPMC SECTION

36.250.030** which according to the Staff Report describes the purpose of the Altos de Monterey

Overlay District, which is to:

> *Maintain the existing architectural character and neighborhood
> environment

> *Recognize, maintain, and augment the standards and conditions of the strict
> Covenants, conditions, and Restrictions (CC&Rs) to which the properties
> within this overlay district are held and conveyed, and which run with land;

> *Provide additional conditions and restrictions not addressed by the CC&Rs
> that are necessitated by the long term residential use of the affected
> properties,

(See page 4 of 2016 <strong>STAFF REPORT</strong>)

A true and correct copy of **SPMC SECTION 36.250.030** is attached hereto as **Exhibit 3** and

incorporated herein by this reference.

32.    The **2016 STAFF REPORT** indicates that the Project is subjected to South Pasadena

Zoning Code requirements of the Hillside Protection Division, which describes the purpose of the

Hillside protections as :

-12-

<strong>Complaint for Declaratory & Injunctive Relief based on 42 USC 1983 & 42 USC 1985</strong>

*Preserving the City's scenic resources;

*Acknowledging the environmental consequence hillside development

*Encouraging appropriate grading practices

*Encouraging appropriate design to maintain the hillside in a natural, open character

*Encouraging siting structures in the least visually prominent location and oriented with the natural topography

(See page 4 of 2016 **STAFF REPORT**)

A true and correct copy of **SPMC SECTION 36.340** is attached hereto as **Exhibit 4** and incorporated herein by this reference.

33.     The **2016 STAFF REPORT** indicates that because the Project has an average slope of over twenty percent (20)% but less than thirty percent (30%) and has an average slope of twenty six and one -tenth percent (26.1%) the project needs to apply for a Hillside Development Permit.  The **2016 STAFF REPORT** then goes on to present this average slope without any presentation of its data and methodology regarding its calculation of the average slope.

(See page 4 of 2016 **STAFF REPORT**)

34.     The **2016 STAFF REPORT** indicates that the Project must be subjected to the Hillside Development Permit process pursuant to **SOUTH PASADENA MUNICIPAL CODE SECTION 36.410.065**, a true and correct copy of which is attached hereto as **Exhibit 5** and incorporated herein by this reference.   The **2016 STAFF REPORT** states : "Following a public hearing, the Planning Commission may approve, conditionally approve, or disapprove the application only after the following five (5) findings are made:

-13-

1. The proposed use complies with the requirements of Division 36.340 (Hillside Protection)

2. The proposed use is consistent with the General Plan and any applicable Specific Plan

3. The establishment, maintenance, or operation of the use would not, under the circumstances of the particular case, be detrimental to the health, safety, or general welfare of persons residing or working in the neighborhood of the proposed use.

4. The use, as described and conditionally approved, would not be detrimental or injurious to property and improvements in the neighborhood or to the general welfare of the City

5. The design, location, operating characteristics, and size of the proposed use would be compatible with the existing and future land uses in the vicinity, in terms of aesthetics, character, scale, and views protection.

(See page 4 and 5 of 2016 **STAFF REPORT**)

35.    In addition, according to the **2016 STAFF REPORT**, the Project is subject to the **South Pasadena General Plan** and in particular **Chapter 2.5G: Hillside Development** (attached hereto as **Exhibit 6** and incorporated herein by this reference) which provides, in relevant part:

> **GOAL 19: To ensure that new development within hillside areas of South**
>
> **Pasadena does not adversely impact the character of the city**
>
> **Policies:**
>
> **19.1:    Regulate all hillside development. Closely monitor all hillside**
>
> **Development require design review of all projects.**
>
> **19.2:    Maintain and enhance zoning standards for hillside development.**

**19.3:**       **Augment existing grading standards. Maintain hillside development**

**standards that eliminate the negative visual effects of grading,**

**require the preservation of unique natural features.**

The design of Applicants project involving the wholesale decimation and excavation and

removal from the Project premises of an entire hillside -- as well as **THE LACK OF**

**ADMINSTERING A DESIGN REVIEW OF THE PROJECT EVEN THOUGH A**

**DESIGN REVIEW IS MANDATORY --** indicates a complete abdication by Defendants of

**ANY COMPLIANCE** with the requirements of the **SOUTH PASADENA General Plan,**

which in and of itself renders the Project **ILLEGAL** but Defendants "turned a blind eye" to

these transgressions and approved the Project regardless keeping Plaintiff in the dark and

creating a hazardous project in violation of Plaintiff's Constitutional Rights of Due Process and

Equal Protection in violation of 42 USC 1983 and 42 USC 1985.

36.     The above language is inherently vague and lacks any ascertainable standard from which

to make a decision as to whether or not the project complied with the requirements of the Altos

de Monterey Overlay District and the South Pasadena Municipal Code as well as the South

Pasadena General Plan.  Essentially, the language is written so loosely that Staff can interpose

their opinion as to whether or not the Project complies with these requirements  and also give the

Staff the options to ignore any information and data is that reveals that the project is NOT in

compliance with the requirements.  This gives rise to injustice in situations like this in which the

statutory language gives the Staff and the elected officials the option to issue approvals when

there are issues and facts that indicate the contrary but which are deliberately ignored or

eschewed with a sense of impunity.

Complaint for Declaratory & Injunctive Relief based on 42 USC 1983 & 42 USC 1985

37.     So the **statutory scheme** used by **SOUTH PASADENA** is **UNCONSTITUTIONAL ON ITS FACE** and **UNCONSTITUTIONAL AS APPLIED** in this instance.  Specifically, the vague and ambiguous language in the statutory scheme provided Staff and the Planning Commission the opportunity to continue to "rubber stamp" Hillside Development projects regardless of whether they complied with the law.

38.     The consequence of this unconstitutional scheme is the utter decimation of the natural hillsides in **SOUTH PASADENA**, with each hillside destroyed based upon any Applicant's desire to expand the flat area in the Applicant's backyard, with the Defendants continuing to approve these expansions because the law is so vague and ambiguous that the Defendants can do whatever they want to do, which is usually to capitulate and please the Applicant, who is normally affluent and expecting that it is acceptable to transform their multi-million dollar large tract homes into "mini estates", not realizing that the original Altos de Monterey CC& R's envision natural hillsides being preserved -- as such was a "signature feature" of **SOUTH PASADENA ("The City of Trees")**, which ironically was being decimated by individual homeowners on an ad hoc basis with the advice and consent and complicity of Defendants.

39.     Unfortunately, this "high wide and loose" approach to approving individual projects that eradicate and decimate natural hillsides can have potentially deadly and hazardous consequences, such as in this instance with the adjacent residential property of Plaintiff.  Sadly, and perhaps unwittingly, the Defendants have "rubber stamped" the Applicants' Project and then **TURNED A BLIND EYE TO THE HAZARDOUS CONDITIONS IMPOSED BY APPLICANT'S PROJECT** that have created an insidiously perilous scenario that does not only violate the law but also poses a threat to the Plaintiff and his family, all of which violate Plaintiff's Due Process and Equal Protection Constitutional Rights secured by the Fifth and Fourteenth Amendment and thus violate of 42 USC 1983 and 42 USC 1985.

40.     Specifically, Plaintiff presents the following violations arising from the City Staff's

-16-

Recommendation and the Planning Commission's approval of the Project **EVEN THOUGH THESE HAZARDS ARE IN PLAIN SIGHT OF ANY PLANNING PROFESSIONAL** and should have been focused upon and evaluated by Defendants prior to recommending approval of and approving Applicant's Project.

41.    Here are the violations that were overlooked by Defendants as they violated Plaintiff's Constitutional Rights of Due Process and Equal Protection via a well honed custom policy and practice of administering a configuration of laws and procedures that were vague and subject to no ascertainable standards and thus were **UNCONSTITUIONAL ON THEIR FACE** and **UNCONSTITUTIONAL AS APPLIED**, as follows:

A.   The Excavation and Retaining Walls for 1627 Via Del Rey, South Pasadena, CA 91030 was originally permitted on 08/24/2016. A second permit to construct a six (6) feet high retaining wall, 140 feet long was issued on 12/09/2020, and on 08/04/2021 a second grading permit – **BUT NEITHER OF THOSE EX POST FACTO PERMITS WERE SUBJECTED TO A PUBLIC HEARING OR EVEN EVALUATED IN LIGHT OF THE CONFIGURATION OF LAWS USED IN 2016 TO ISSUE THE ORIGINAL PERMIT.**

B.   The Defendants maintain **INCOMPLETE PLANS** at the South Pasadena Building Department – which makes it almost impossible to figure out what is happening at the Project Site, which gives rise to illegal and hazardous construction conditions. Nevertheless, the project is currently under construction. Excavation and footing trenches for a retaining wall are completed and rebar is being installed – and the rebar is sticking out of the ground like spears upon which Plaintiff and his family could fall and impale themselves from the vertical approximately five (5) feet drop immediately adjacent to

-17-

them (See pictures of exposed rebar attached hereto as **Exhibit 7** incorporated herein by this reference).

C.  The only design and construction plans available to review for this project at the South Pasadena Planning and Building Department as of the date of the filing of this Complaint are:

1.  Site Survey prepared by Ron Martinez, RM Land Surveying

2.  Site Plan prepared by an unlicensed "ARTIST" with Dynamo Construction

3.  Six (6) foot high retaining wall detail prepared by Ricardo Garcia, Civil Engineer, Polytech Consulting, Inc.

These documents are woefully inadequate and are so beneath the standard of care for engineering and planning professionals erecting a project that involves the movement off the premises of **TWENTY--FIVE FULL DUMP TRUCKS OF EXCAVATED HILLSIDES (350 Cubic Yards—Forty 40% of vacant area)** and nine hundred (900) concrete masonry unit ("CMU") blocks and hundreds of cubic yards of concrete and thousands of feet of rebar – and note the **2016 Staff Report** indicated that the Project involved "minimal grading", **WHICH IS DISHONEST AND FRAUDULENT**

D.  The Engineer and Constructions Plans **THAT SHOULD BE AVAILABLE** and relied upon by Defendants but are **NOT AVAILABLE (and were never required by Defendants)** are, as follows:

1.  Survey showing the adjoining residences facing excavation for design stability

2.  Soil Report

Complaint for Declaratory & Injunctive Relief based on 42 USC 1983 & 42 USC 1985

3. Drainage Plan and Details

4. Complete set of construction documents for the 2021 Permit, including:

   a) Completed Survey

   b) Soil Report

   c) Site Plan

   d) Drainage Plan

   e) Retaining Wall Design Section (based upon Soil Report)

   f) Landscape Plan at retaining wall and the location of the pool equipment

5. The Design Review of the forty two inch high (42") Protection Barrier Design, above the six (6) feet wall, between the Project Site and the Defendant's property.

E. **TO MAKE MATTERS MOVE FROM BAD TO WORSE** the following presents the Sections in the **2016 STAFF REPORT** that are **NOT IN COMPLIANCE WITH THE CODES**, as follows:

1. Even though the **2016 STAFF REPORT** reflects that the Hillside Protection Act SPMC 36.340 encourages appropriate design to maintain the hillside in a natural open character, THIS does not happen in this Project, as follows:

   a) The excavation gouges into the natural hillside as a level rectangular cut with one hundred forty (140) feet of retaining walls and the vacant land at the rear of the property is 5880 square feet with the excavation area being 2380 square feet or

Forty Percent (40%) of the vacant area (which flies in the face of **SPMC 36.340's** requirement that the Project "maintain the hillside "in a natural open character").

2. Even though the **2016 STAFF REPORT** on Page 4 represents "Minimal grading is required for this Project" nothing could be further from the truth because three hundred fifty (350) cubic yards of soil requires that a ten (10) wheel dump truck (which holds ten (10) to fourteen (14) cubic yards of soil) **HAUL TWENTY FIVE (25) DUMP TRUCK LOADS OF EXCAVATED SOIL AWAY FROM THE PREMISES.** That is hardly "minimal grading".

3. The **2016 STAFF REPORT** on Page 4 represents under the section labeled "Drainage" that "Final drainage plan details reviewed prior to granting a building permit". Yet ironically there exist no plans at **SOUTH PASADENA** that are labeled "Drainage Plan" nor did any "Drainage Plan" exist.

4. Even though the **2016 STAFF REPORT** regarding the **HILLSIDE DEVELOPMENT PERMIT** finding represented that "the use would not be detrimental to the health, safety or general welfare of adjoining neighbors" **SUCH A REPRESENTATION IS FALSE.** In fact, *there is a five (5) foot precipitous drop off and grade difference between Plaintiff's property and the project site as a result of the elaborate grading of the hillside* – and that precipitous drop off and grade difference was not addressed or considered EVER in the **2016 STAFF REPORT** or the Design Review or the Plan Check.

-20-

5. THE **2016 STAFF REPORT** on page 5 perpetuates even more Vivid misrepresentations when **IT LIES** and says "The proposed grade between the retaining walls would be generally level". **THIS IS BLATANTLY FALSE!** Plaintiff's adjoining property **IS FIVE (5) FEET HIGHER!!**

F. With respect to the **PERMIT and APPLICATION REQUIREMENTS** required by **SPMC 36.340.030** there is a requirement that the Applicant supply a **GEOTECHNICAL REPORT** (which is also known as a "Soil Report") which provides: "A preliminary report is required for any soils that may affect site stability". In this Project that requirement was **NEVER FULFILLED** because **A GEOTECHNICAL REPORT IS NOT AVAILABLE TO REVIEW**.

G. With respect to **SPMC 36.340.040** entitled **HILLSIDE DEVELOPMENT DESIGN GUIDELINES** there are further violations of the code as follows:

1. The project violates the section entitled **TERRAIN ALTERATION (Page 57)** which provides**:** "The project should be designed to fit the terrain rather than altering the terrain to fit the project. Where alteration of the terrain is necessary, counter grading techniques should be utilized to help achieve a natural appearing slope." **THIS DID NOT HAPPEN.**

2. The project violates the section entitled **RETAINING WALLS (Page**

-21-

**59) which provides:** "Large retaining walls in a uniform plane shall be avoided. Retaining walls shall be divided into terraces with variations and include landscaping." **THIS DID NOT HAPPEN.**

H. With respect to **SPMC 36.410.040** entitled **DESIGN REVIEW CRITERIA** the **2016 Staff Report** requires that there be findings made regarding the "The impact on surrounding properties". **THIS DID NOT HAPPEN.** The staff report is notably silent regarding the Project's impact on any of the surrounding properties or the impact on them and the building profiles and setbacks are not indicated in any way on the Survey.

I. Here are some other violations:

1. The actual building plans and the approved plans as contemplated by the **2016 STAFF REPORT** differ significantly yet there are not any renewed Applications after 2016, with the Project not commencing construction until 2022. Also, the Project did not present any updated information after 2016 even though the Building Codes had changed in 2019 and 2021.

2. In the **2016 STAFF REPORT** the Project is referred to as "Flat Work" which is NOT TRUE as it requires the decimation and excavation of over thirty extremely large truckloads that is the hillside that had existed on the property for centuries.

**THE PERMIT ISSUED PURSUANT TO THE 2016 STAFF REPORT ISSUED BASED UPON A SET OF ORDINANCES AND PLANNING CUSTOMS, POLICIES AND PRACTICES THAT ARE VAGUE AND AMBIGUOUS WITHOUT ANY EVIDENT ASCERTAINABLE**

-22-

**STANDARD AND ARE THUS UNCONSTITUIIONAL ON THEIR FACE
AS WELL AS UNCONSTITUTIONAL AS APPLIED**

42.    Although Plaintiff **CHEUNG** was aware that major alterations were being proposed and implemented at the **LOUIE/KOTANI RESIDENCE,** Plaintiff **CHEUNG** as a citizen and resident of **SOUTH PASADENA** expected the Defendants to protect and preserve his due process and equal protection rights as it related to the permitting process regarding any proposed improvement and/or alterations to the **LOUIE/KOTANI RESIDENCE** that would affect his residential property.

43.    But such expectations and reliance by Plaintiff **CHEUNG** he soon discovered were misplaced as the Defendants then proceeded to approve a Project on the **LOUIE/KOTANI RESIDENCE** engaging in a Planning and Approval process that vividly trammeled Plaintiff **CHEUNG**'s civil rights and has endangered Plaintiff **CHEUNG** by creating a hazardous condition on Plaintiff **CHEUNG'S** residential property.

44.    The **LOUIE/KOTANI RESIDENCE** Project is a travesty, mostly because the Permit to construct the Project was issued based upon as pattern of customs and policies and practices of Defendants to ignore and eschew the specific requirements and conditions presented in the Zoning Codes and other Planning Laws governing this process and manipulate the law and the facts and add some misrepresentations to a Staff Report that was used to fool the Planning Commission to approve a Project that has imperiled the Plaintiff and his family, and which based upon the empirical data presented in this Complaint does not have any legitimate basis in law or fact from which to be constructed.  So many factual problems that result in danger to the Plaintiff were misrepresented and ignored, the most classic of which is the representation to the Planning Commission in the **2016 STAFF REPORT** that the Project involved "minimal grading" when in reality the Project gutted and decimated a supposedly protected Hillside to the point that it scooped a rectangular wedge out of the Hillside and **MOVED THE HILLSIDE OFF PREMISES IN APPROXIMATELY THIRTY TRUCK LOADS OF EXCAVATED SOIL**

-23-

**CARTED OFF BY HUGE TWELVE WHEEL TRUCKS**.   And most importantly, the **2016 STAFF REPORT** misrepresented to the Planning Commission the difference in grade between the Project as completed and Plaintiff's property, which is a five (5) feet tall precipitous free fall in which anybody and everybody visiting Plaintiff's residence needs to be cautioned about – and such a discrepancy is completely inconsistent with the letter and spirit of laws in place that govern the conduct of Defendants but Defendants elected to overlook that issue and recommend approval of these hazardous permits with no regard for the health, safety and welfare of Plaintiff even though the laws in governing this process directed them to make that assessment.

45.     The lies and half-truths and misrepresentations that existed because of the customs and policies and practices of Defendants in light of their loosely interpreted and apparently fungible series of laws has exposed Plaintiff to hazards and peril.   The failure of Defendants to avoid mendacity (lies) regardless of the Defendants evident need and exigent yearning to please the Applicant at the expense of Plaintiff is a state action that violates Plaintiff's Due Process (both substantively and procedurally) and Equal Protection Rights as a citizen and resident and homeowner in **SOUTH PASADENA**.

46.     Congress enacted 42 USC 1983 and 42 USC 1985 as successor legislation to The Civil Rights Act of 1871 (known as the "Klu Klux Klan Act") which was a set of laws passed during Reconstruction aimed at protecting Emancipated Citizens from the consequences of "Jim Crow" laws, which were local ordinances enacted and applied unfairly to the point of cruelly disenfranchising the citizenship rights of Emancipated Citizens, and providing a remedy in which the deprivation of those rights could be adjudicated and then redressed, with the consequences of tyrannous self-serving legislative actions being ameliorated in the process of administering justice – and during that period in our history the Federal Courts indeed were considered to be beacons and fortresses of Constitutional Freedoms, each an "oasis in the desert" so to speak, in which dignity could be restored as justice was effectuated.

Complaint for Declaratory & Injunctive Relief based on 42 USC 1983 & 42 USC 1985

47.    Plaintiff does not seek these remedies with anything but a heavy but uplifted heart. Because after all is said and done, Plaintiff's efforts are all philosophically centered around the goal of promoting an impartial application and administration of the laws so that they effectuate their true purpose, which Plaintiff hopes is that virtuous collaborative elixir of inspiration and faith and goodwill and serenity,  amongst and between all of us and each of us, in this sparkling community known as the City of Trees, in which our paths often cross on a daily basis as we go about our life endeavors, seeking free will and purpose with the expectation of success and satisfaction as we endure many things and continue to endure many things, with our eyes high on the horizon, locked onto the goal of peace and progress, in the same way that the great Chief Hahamogna centuries ago locked eyes and offered a friendly hand as greeted Gaspar de Portola, not quite certain what the future held but beckoned by the call of something better.

48.    Plaintiff only seeks here the chance of obtaining justice in these circumstances – and he does not approach this court un armed without tangible admissible evidence and without truths. In fact, Plaintiff comes to this court bearing the poisonous fruits of injustice in bushels under each arm, all contained in the words and the exhibits of this Civil Rights Complaint, which reveal the Planning customs, policies and practices in a small and glittering city in Southern California, that ignores its own rules and regulations as well as its charter and issues Permits indiscriminately, in this case to the detriment and peril of Plaintiff, and in violation of his Civil and Constitutional Rights as secured by the Fifth and Fourteenth Amendment and in violation of 42 USC 1983 and 42 USC 1985 as a consequence of a scheme in which a series of illegal and hazardous permits were issued via a civil conspiracy by Defendants to violate Plaintiff's civil rights and violate Plaintiff's civil rights in violation of 42 USC 1983 and 42 USC 1985.

49.    And at the end of this earnest effort to ask this Honorable Court for assistance, the Plaintiff is reminded of a favorite John Locke quotation that remained firmly in his mind as he created this Complaint, as follows:

**Complaint for Declaratory & Injunctive Relief based on 42 USC 1983 & 42 USC 1985**

**Freedom of men under government is to have a standing rule to live
by, common to every one of that society and made by the legislative
power vested in it and not to be subject to the inconstant,
uncertain, arbitrary will of another man.**

**-- John Locke**

**WHEREFORE**, Plaintiffs pray that this Court will issue the following Orders:

1. Preliminary and permanent injunctions enjoining and restraining Defendants' efforts to issue any further approvals and also to issue affirmatively a **STOP WORK ORDER** of the Project being constructed at the **LOUIE/KOTANI RESIDENCE**; and

2. An Order appointing a **SPECIAL MASTER** to review and evaluate the legality as well as the safety of Defendants' approval of the Project being constructed at the **LOUIE/KOTANI RESIDENCE** as well as to make recommendations to this Court, with a Report being issued by that **SPECIAL MASTER** for review and comment by the parties to this litigation and then adjudicated at an evidentiary hearing;  and

3. An Order that Defendants scrupulously maintain and preserve any and all planning records relating to the **LOUIE/KOTANI** residence as well as not discard or destroy or conceal or lose **ANY** and **ALL** public records relating to the Planning process governing **SOUTH PASADENA**;  and

4. A Declaratory Judgment adjudging the actions of the Defendants to be  violations of the Plaintiff's Constitutional Rights of Due Process & Equal Protection secured to Plaintiff by the Fifth and Fourteenth Amendments of the United States Constitution;  and

5. Special Damages in an amount according to proof;

6. Punitive and Exemplary Damages in an amount according to proof;

-26-

Complaint for Declaratory & Injunctive Relief based on 42 USC 1983 & 42 USC 1985

7. Attorney's fees, if any, and costs;

8. Such other and further relief as to this court seems just and proper.


## DEMAND FOR JURY TRIAL

Respectfully Submitted,

Dated: March 16, 2022

*James Cheung*

_____

James Cheung
Plaintiff In Pro Se

Complaint for Declaratory & Injunctive Relief based on 42 USC 1983 & 42 USC 1985

# E X H I B I T   1

Complaint for Declaratory & Injunctive Relief based on 42 USC 1983 & 42 USC 1985



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19

# EXHIBIT 2

20
21
22
23
24
25
26
27
28

Complaint for Declaratory & Injunctive Relief based on 42 USC 1983 & 42 USC 1985

# PLANNING COMMISSION STAFF REPORT

| |
|---|
| Steven Dahl, Chair |
| Evan Davis, Vice-Chair |
| Kristin Morrish, Commissioner |
| Richard Tom, Commissioner |
| Kelley M. Koldus, Commissioner |
| |
| David G. Watkins, AICP, Director |
| Holly O. Whatley, Assistant City Attorney |

**AGENDA DATE:**    May 23, 2016

**TO:**    **Chairman and Members of the Planning Commission**

**VIA:**    **David G. Watkins, AICP, Director of Planning & Building**

**FROM:**    **Knarik Vizcarra, Assistant Planner**

**SUBJECT:**    **Hillside Development Permit (Excavation, Pool, and Retaining Walls)**
**Project No. 1899-HDP**
**1627 Via Del Rey**

---

**APPLICANT:**    **LARRY LASCHNER (REPRESENTING EDMUND LOUIE AND DEBORAH KOTANI, HOMEOWNERS)**

**REQUESTED ACTION:**    **A REQUEST FOR APPROVAL OF A HILLSIDE DEVELOPMENT PERMIT TO CREATE AN EVEN AREA FOR RECREATIONAL USE, CONSTRUCT A POOL, AND SURROUNDING RETAINING WALLS OF A DEVELOPED UPSLOPE LOT LOCATED AT 1627 VIA DEL REY.**

**RECOMMENDATION:**    **ADOPT P.C. RESOLUTION NO. 16-__; APPROVING HILLSIDE DEVELOPMENT PERMIT, PROJECT NO. 1899-HDP SUBJECT TO CONDITIONS OF APPROVAL.**

**REFERENCES**

**GENERAL PLAN:**    **ALTOS DE MONTEREY RESIDENTIAL**

**ZONING:**    **ALTOS DE MONTEREY (AM)**

**CODE SECTIONS:**    **36.250.030, 36.340.040, 36.410.040 AND 36.410.065**

**CEQA:**    **NEGATIVE DECLARATION**

Planning Commission Staff Report
- 2 -

## BACKGROUND

| | |
|---|---|
| 02-29-16 | Larry Laschner, from Dynamo Constructors, representing the homeowners submitted an application for removal of 350 cubic yards of dirt to create an even usable recreational space, construct a pool, and retaining walls surrounding the new area in the back yard of an existing house located on a hillside lot. |
| 04-14-16 | The application was deemed complete. |
| 04-28-16 | A public hearing notice was published in the Pasadena Star News advertising the May 23, 2016 Planning Commission hearing. |
| 05-03-16 | Post cards advertising the May 23, 2016 public hearing were mailed to all property owners and residents within a 300' radius of the site. |
| 05-04-16 | Pursuant to CEQA Section 15300 et seq., an Initial Study/Negative Declaration was filed with Los Angeles County Registrar-Recorder's Office and all applicable agencies. |
| 05-18-16 | At printing time of this report, no inquiries were received regarding this project. |

## SITE AND PROJECT DESCRIPTION
1. The Site

The project is proposed on a 12,276 square foot lot with an average with of about 70 feet and an average depth of approximately174 feet.  The property is located on the north side of Via Del Rey (note the orientation of the street changes from one end to the other as it curves) and is within the Altos de Monterey Overlay (AM) zone.  The site is bound by single family properties in the AM zone to the north, west and east, and the Monterey Hills Elementary School to the south.

Planning Commission Staff Report
- 3 -



Aerial image of subject project and surroundings (taken from Google Maps)

2. The Project

The Planning Commission will consider a request for a Hillside Development Permit to construct a new pool and create flat outdoor recreational space by removing 350 cubic yards of the hillside in the backyard and constructing 6 foot high retaining walls surrounding the new usable outdoor space. No other improvements are proposed to the existing house itself.

## ZONING CODE CONSIDERATIONS AND ANALYSIS

1. Altos de Monterey

SPMC Section 36.250.030 describes the purpose of the Altos de Monterey Overlay District: Maintain the existing architectural character and neighborhood environment; recognize, maintain, and augment the standards and conditions of the strict Covenants, Conditions, and Restrictions (CC&Rs) to which the properties within this overlay district are held and conveyed, and which run with the land; and provide additional conditions and restrictions not addressed by the CC&Rs that are necessitated by the long term residential use of the affected properties, and to maintain the existing architectural character and neighborhood environment.

Per SPMC Section 36.250.030, the CC&Rs are also upheld by the City. Therefore, any regulations within the CC&Rs that are more restrictive than those in the Altos de Monterey regulations in the Zoning Code have been applied to the proposed project.

*The proposal includes a plan to excavate a portion of the backyard of an existing developed to allow for the creation of an even recreational space with a pool. Supporting retaining walls are proposed surrounding the new area. No design review is required for flat work; the conditions of approval simply require that stucco be applied to the concrete block retaining*

Planning Commission Staff Report
- 4 -

*walls.*

*No changes are proposed to any the house, thus no design review is required.*

3. Hillside Protection

SPMC Section 36.340 describes the purpose of the Hillside Protection Division as preserving the City's scenic resources, acknowledging the environmental consequence of hillside development, encouraging appropriate grading practices, and encouraging appropriate design to maintain the hillside in a natural, open character.

The proposed addition would be located at the back of the existing house and not visible from the street. No views would be obstructed as a result of the proposed project. Grading for this project will be minimal as the addition would be located on a previously graded portion of the lot; some grading is required for the proposed retaining wall (required by the Building Division). The Zoning Code's Hillside Development Guidelines encourage siting structures in the least visually prominent location and oriented with the natural topography (SPMC Section 36.340.040(C)).

Pursuant to SPMC Section 36.340.020, any development on sites with an average slope of 20% or greater require a Hillside Development Permit. In this case, when applying the slope formula required by the Code, the subject parcel has a total average slope of 26.1%.

4. Soils and grading

Minimal grading is required for this project. A soils report may be required by the Building Division during plan check.

5. Drainage

Final drainage plan details will be reviewed during the Building Division's "Plan Check" process prior to granting a building permit. According to the

## HILLSIDE DEVELOPMENT PERMIT

Pursuant to SPMC Section 36.410.065, following a public hearing, the Planning Commission may approve, conditionally approve, or disapprove the application only after the following five findings are made:

1. **The proposed use complies with the requirements of Division 36.340 (Hillside Protection)[1] and all other applicable provisions of this Zoning Code.**

   The proposed project is located within the Altos de Monterey Overlay District and complies will all applicable development standards. The proposed project is confined to the backyard of an existing developed upsloping hillside lot. No alterations are proposed to the house. The proposed retaining walls comply with the 6 foot height limit specified in the Zoning Code, and the applicant would be required to apply stucco to the exterior of the concrete block wall. So, the project complies with all applicable requirements of the Zoning Code.

2. **The proposed use is consistent with the General Plan and any applicable Specific Plan.**

---

[1] The AM zone is only subject to the AM development standards and not the hillside development standards, per SPMC Section 36.250.030.C

Planning Commission Staff Report
- 5 -

The South Pasadena General Plan Section 2.5G outlines the Goals for Hillside Development. Goal 19 of the General Plan is to ensure that new development within hillside areas of South Pasadena does not adversely impact the character of the city.

The proposed project would export approximately 350 cubic yards of dirt to create a usable even recreation area with a pool, consistent with neighboring properties. This would not adversely impact the character of the city at large. The use remains a single family residence in an area designated for low density residential uses.

3. **The establishment, maintenance, or operation of the use would not, under the circumstances of the particular case, be detrimental to the health, safety, or general welfare of persons residing or working in the neighborhood of the proposed use.**

The use of the property will not change from the existing single-family residence in the Altos de Monterey Overlay District. The proposal is to create and even recreational area in the back yard and construct a pool. As such, the establishment, maintenance and operation of the proposed use is anticipated and permitted by the General Plan and Zoning Code. The applicant is subject to the conditions of approval imposed by the City's Fire, Public Works, Planning and Building Departments. Since the subject site is located directly across the street from an elementary school, construction and vehicle activity related to the construction will be restricted per the conditions of approval. Therefore, the use would not be detrimental to the health, safety or general welfare of adjoining neighbors.

4. **The use, as described and conditionally approved, would not be detrimental or injurious to property and improvements in the neighborhood or to the general welfare of the City.**

The proposed project would not be detrimental or injurious to property and improvements in the neighborhood or to the general welfare of the City. The applicant would be required to follow comply with all applicable codes that include any requirement to improve drainage on the property that would be altered as a result of the proposed project. As such, the proposed project would not be detrimental or injurious to property and improvements in the neighborhood or to the general welfare of the City.

5. **The design, location, operating characteristics, and size of the proposed use would be compatible with the existing and future land uses in the vicinity, in terms of aesthetics, character, scale, and views protection.**

The proposed project design, location, and size are compatible with the existing and future land uses in the vicinity in terms of aesthetics, character, scale and view protection. The proposed grade between the retaining walls would be generally level. The retaining walls will be concrete block with a stucco finish and limited to a 6 foot height.

## ENVIRONMENTAL ASSESSMENT

After conducting an Initial Study (Attachment 2), staff determined that the proposed project is subject to a Negative Declaration under the provision of the California Environmental Quality Act (CEQA). Pursuant to Guidelines Section 15371, Pub. Res. Code section 21092.6(a) the document was sent to all affected agencies on May 4, 2016. As shown in the attached Initial Study, the project will not result in, or create any significant impacts to the Land Use and Planning, Population and housing, Geologic Problems, Water, Air quality, Transportation and

Planning Commission Staff Report
- 6 -

Circulation, Biological resources, Energy and Mineral Resources, hazards, Noise, Public Service systems, Aesthetics, Cultural resources, or Recreation.  As such, no mitigation is necessary as part of the Initial Study.

## LEGAL REVIEW

The Assistant City Attorney has reviewed the staff report.

## CONCLUSION

Based on the above analysis, staff has determined that the hillside findings can be made to grant the Hillside Development Permit.  Therefore, staff recommends that the Planning Commission adopt the Negative Declaration, and approve the Hillside Development Permit, Project No. 1899-HDP, subject to the recommended conditions of approval.

## ALTERNATIVES

In addition to staff's recommendation, the following alternatives are available for the Planning Commission's consideration:

1. Identify the issues of concern with the proposed project, and provide the applicant with direction to further modify the project, and continue the public hearing to a date certain; or

2. Deny the application for Hillside Development Permit, Project No. 1566-HDP.

## Attachments:

1. Draft PC Resolution No. 16-__
    a. Exhibit "A" – Negative Declaration
    b. Exhibit "B" – Conditions of Approval
3. Photos
4. Project Plans

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18

# E X H I B I T   3

19
20
21
22
23
24
25
26
27
28

Complaint for Declaratory & Injunctive Relief based on 42 USC 1983 & 42 USC 1985

D.   Design guidelines. Land uses and structures proposed within the special purpose zoning districts shall comply with any adopted design guidelines to the extent required by the appropriate Review Authority and/or specific provisions of the design guidelines.

(Ord. No. 2108 § 1; Ord. No. 2183 § 6, 2009.)

### Division 36.250. Overlay Zoning Districts

Sections:

**36.250.010    Purpose of Division.**
**36.250.020    Applicability of Overlay Zoning Districts.**
36.250.030    Altos de Monterey (AM) Overlay District.
**36.250.040    Focus Area (FA) Overlay District.**

### 36.250.010 Purpose of Division.

This Division regulates new and existing structures and land uses in the overlay zoning district established by Section 36.200.020 (Zoning Map and Zoning Districts). The provisions of this Division provide guidance for development in addition to the standards and regulations of the primary zoning district, where important site, environmental, safety, compatibility, or design issues require particular attention in project planning.

(Ord. No. 2108 § 1.)

### 36.250.020 Applicability of Overlay Zoning Districts.

The provisions of this Division apply to proposed land uses and development in addition to all other applicable requirements of this Zoning Code. Any perceived conflict between the provisions of this Division and any other provision of this Zoning Code shall be resolved in compliance with Division 36.110 (Interpretation of Zoning Code Provisions).

A.   Mapping of overlay districts. The applicability of any overlay zoning district to a specific site is shown by the overlay Zoning Map symbol established by Section 36.200.020 (Zoning Map and Zoning Districts), being appended as a suffix to the symbol for the primary zoning district on the Zoning Map. The overlay districts are applied to property through the rezoning process (Division 36.620).

B.   Allowed land uses, permit requirements, development standards. Except as may be otherwise provided by this Division for a specific overlay district:

1.   Any land use normally allowed in the primary zoning district by this Article may be allowed within an overlay district, subject to any additional requirements of the overlay district;

2.   Development and new land uses within an overlay district shall obtain the zoning approvals required by this Article for the primary zoning district; and

3.   Development and new land uses within an overlay district shall comply with all applicable development standards of the primary zoning district, all other applicable provisions of this Zoning Code (e.g., Article 3—Site Planning and General Development Standards), and any adopted design guidelines to the extent determined by the appropriate Review Authority and/or specific provisions of the design guidelines.

(Ord. No. 2108 § 1; Ord. No. 2183 § 7, 2009.)

### 36.250.030 Altos de Monterey (AM) Overlay District.

A.  Purpose. The standards and conditions provided by this Section for the AM Overlay District are intended to:

    1.  Maintain the existing architectural character and neighborhood environment;

    2.  Recognize, maintain, and augment the standards and conditions of the strict Covenants, Conditions, and Restrictions (CC&Rs) to which the properties within this overlay district are held and conveyed, and which run with the land; and

    3.  Provide additional conditions and restrictions not addressed by the CC&Rs that are necessitated by the long term residential use of the affected properties, also to maintain the existing architectural character and neighborhood environment.

The AM overlay district is consistent with the Altos de Monterey land use category of the General Plan.

B.  Applicability.

    1.  Area affected. The AM overlay district is applied to areas identified on the zoning map indicated with the AM overlay district suffix symbol. These areas specifically include Parcels 1 through 57, Parcels 59-639, and Lot 3 of PM 7380, Tract 25588, as designated and recorded in Book 713, pages 51-77 inclusive of maps in the Office of the Los Angeles County Recorder (hereinafter described as either Tract 25588 or the AM overlay district.

    2.  Applicability of standards. The standards of this Section apply to any additions, remodels or new construction proposed in the AM overlay district, in addition to all other applicable requirements of this Zoning Code.

C.  Allowable land uses and permit requirements. Land uses within the AM overlay district shall be limited to the following.

    1.  Permitted uses. Only the following uses are permitted within the AM overlay district.

        a.  One single-family dwelling is allowed on each legally subdivided lot not otherwise designated for semi-public or public use, subject to Planning Clearance (Section 36.410.020) and Design Review (Section 36.410.040). All structures shall be constructed on site, except that manufactured homes as defined in Government Code Section 65852.3 shall be permitted to the extent required by the Government Code.

        b.  Public or semi-public open space currently maintained on Lots 117 (Lot 3 of Parcel Map 7380), 488 and 489 of Tract 25588 ("Open Space Lots") shall be zoned and designated in the General Plan as open space in perpetuity.

        c.  Trash containers, including recycling containers, may be placed forward of the required front yard setback for a maximum of 24 hours per week, immediately preceding and following trash pick-up.

        d.  Accessory structures not exceeding 600 square feet (except for garages and carports) provided that no kitchen, sleeping or restroom facilities are provided (except that an unenclosed gazebo may have an "outdoor kitchen" (grill, sink, wet bar, etc)); and they are not used for separate residential purposes. A lot with a permanent (requires a construction permit/s) swimming pool or spa pool may have a poolhouse or cabana with a sink and/or shower and/or toilet. When a poolhouse has a toilet, a covenant shall be required stating that

the poolhouse shall be maintained as an accessory structure and not be used for sleeping quarters or be converted to a residential use. The purpose of the covenant is to ensure that subsequent owners of the property are aware of this restriction. This covenant shall be recorded against the property's title, and evidence of recordation shall be provided to the Planning and Building Department prior to the issuance of a construction permit.

e.   The accessory storage of building materials during on-site construction and for a maximum of 30 days after the completion of construction.

f.   Private athletic facilities and swimming pools.

g.   Washer/dryer hookups (water and gas supply and sewer connection) and/or a hand or utility sink, and a water heater in an attached or detached garage, subject to SPMC 36.350.170(B)(3).

2.   Conditional uses. The following accessory uses may be allowed subject to Conditional Use Permit approval.

a.   Temporary facilities not related to on-site construction, nor for residential purposes.

b.   The temporary use of trailers or motor homes.

c.   Second dwelling units in compliance with Section 36.350.200.

d.   Amateur radio antennas taller than 15 feet.

e.   Community gardens in compliance with Section 36.350.230.

D.   Development standards. Proposed development and new land uses shall comply with the requirements in Table 2-7, and the following.

1.   Subdivision. The subdivision of any existing lot within the tract shall be prohibited; provided that lot mergers and minor lot line adjustments may be allowed in compliance with Table 2-7.

2.   Utilities. In recognition of the design of tract infrastructure, new hookup of plumbing, natural gas, or electric service from lots outside of the tract to any of these services within the tract shall be prohibited.

E.   Design Review criteria. In addition to making the findings required for Design Review by Section 36.410.040 (Design Review), the appropriate Review Authority shall also consider the following guidelines before any application may be approved:

1.   The scale of the proposed building, design height and mass in relation to the street frontage, to all setbacks and surrounding existing property;

2.   The relation of existing adjoining building heights and their views;

3.   The relation of proposed building heights to the existing topography;

4.   The impact on surrounding properties; and

5.   The obstruction of sunlight to the existing adjoining residences.

F.  Nonconformities. Nonconforming uses, structures, and lots within the AM overlay zone are subject
to the requirements of Section 36.360.120 (Altos de Monterey Nonconforming Use Provisions).

| TABLE 2-7. AM OVERLAY DISTRICT DESIGN AND DEVELOPMENT STANDARDS | |
|---|---|
| Development Feature | Requirement |
| Minimum lot size | Minimum area and width for new parcels. |
| Area and width | As shown on Final Tract Map 25588, except for mergers and lot line adjustments, provided that such actions shall not cause any significant gain or loss in the area of the tract. The subdivision of any existing lot is prohibited. |
| Width, flag lot "pole" | 30 ft; frontage width may be 25 feet for parcels 306 and 307 to accommodate a 10-foot wide path parallel to the flag lot stem. |
| Setbacks | Minimum setbacks required, except as provided by Section 36.300.030 (Setback Measurement and Exceptions) |
| Front and side | See Table 2-8 (AM Overlay District Setback Requirements). The side setback requirements in the table identify each side (i.e., 15'-5' means 15 ft on one side and 5 ft on the other). |
| Rear | 25 ft |
| Second story | 20 ft from the front setback line |
| Between structures | 10 ft |
| Sight distance | Intersection: no visual obstructions between 2 and 6 feet above the ground on corner lots measured 25 feet across street corner. Driveways: no visual obstruction between 2 and 6 feet above the ground within 10 feet of a driveway and street. |
| Lot coverage | 40% maximum |
| Floor Area Ratio (FAR) | 0.35 for main building area of multi-floor structures, maximum |
| Minimum floor area | 1,250 sf for each dwelling |
| Height limit | Maximum height of structures, measured from a point 6 inches above the high point of the existing grade line at the existing, previously set front yard setback line to the highest point of the roof or parapet wall. All heights shall be measured at any point along the building line. |
| Primary structure | 25 ft |
| Height limit (Continued) | |
| Detached accessory structure | 15 ft |
| Fences | Front yard—2 ft within a sight distance area, 3 ft elsewhere; side and rear yards—6 ft. Fence height includes garden walls, shrubs and hedges. |

2/9/22, 10:39 AM                                    Article 2 Zoning Districts, Allowable Land Uses, and Zone-Specific Standards

| TABLE 2-7.  AM OVERLAY DISTRICT DESIGN AND DEVELOPMENT STANDARDS ||
|---|---|
| Development Feature | Requirement |
| Landscaping | As required by Division 36.330 (Landscaping Standards). No impervious surface shall be allowed in a required front or street side setback area, except for a driveway or approved drainage structure. All trees shall comply with the requirements of Ordinance No. 1991. |
| Parking and loading | • Dwellings require 3 off-street spaces (2 in a garage or carport), that are a minimum of 10 ft wide by 20 ft long, and entirely located to the rear of the front setback line.<br>• No vehicle, trailer, boat or component thereof shall be stored on any parking space or driveway, or access thereto, except in a garage or carport, or behind a solid wall or fence that screens the stored object from public view.<br>• No vehicle, trailer, boat, or component thereof, or other object shall be parked or stored for more than 72 hours in any required setback.<br>• Garage door openings should not face the street when feasible, as determined by the DRB. |
| Driveway requirements | |
| Width | 9 feet minimum, 12 feet maximum.<br>Flag lots:10 feet minimum, 20 feet maximum |
| Circular driveway restrictions | Minimum lot width 80 ft; may occupy a maximum of 40% of the front yard area. |
| Drainage | Lots shall drain to the street. Drainage patterns established at the time of original lot grading shall not be disturbed except through the installation of conveyances approved by the City that conduct all surface runoff to the nearest public street or public drainage structure. |
| Grading—Cut and fill | 2:1 maximum slope |
| Fences and walls | Garden fences and walls. Maximum height shall not exceed 6 ft along any property line or within any required setback, except for front yard and street side setback areas where the maximum height shall not exceed 36 inches. Trees or shrubs planted to achieve the same effect as a garden fence or wall shall also comply with these height limitations.<br>Retaining walls. Retaining wall height shall not exceed 6 feet. Where more than one wall is built, the walls shall be separated by a distance equal to the wall height. |
| Mechanical equipment | Roof mounted equipment except solar collection devices shall not be allowed. All plumbing vents shall not be visible from the street frontage. Ground-mounted HVAC equipment shall be screened from public view. Antennas and satellite dishes are exempt from these requirements. |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

# EXHIBIT 4

19

20

21

22

23

24

25

26

27

28

Complaint for Declaratory & Injunctive Relief based on 42 USC 1983 & 42 USC 1985



**Figure 3-24. Parking Lot Planter Areas**

   d.   Larger projects. Parking lots with more than 150 spaces shall provide a concentration of
landscape elements at primary entrances, including specimen trees, flowering plants,
enhanced paving, and project identification.

(Ord. No. 2108 § 1; Ord. No. 2183 § 14, 2009.)

**36.330.050 Maintenance of Landscape Areas.**
A.   Maintenance required. All landscaped areas shall be maintained in a healthful and sound condition
at all times, in compliance with the approved Landscape Plan. Irrigation systems and their components
shall be maintained in a fully functional manner consistent with the originally approved design and the
provisions of this Division. The maintenance required by this Section shall include checking, adjusting,
and repairing irrigation equipment; resetting automatic controllers; aerating and dethatching turf areas;
adding/replenishing mulch, fertilizer, and soil amendments; the replacement of dead or diseased
plants; pruning; and weeding all landscaped areas.

B.   Water waste prohibited. Water waste in existing developments resulting from inefficient landscape
irrigation leading to excessive runoff, low head drainage, overspray, and other similar conditions where
water flows onto adjacent property, nonirrigated areas, walks, roadways, or structures is prohibited.

(Ord. No. 2108 § 1.)

**36.330.060 Landscaping Education.**
The project applicant shall provide information to prospective buyers of new single-family homes
regarding water-efficient landscaping techniques. A sample of the information to be provided shall be
submitted to the Director for approval prior to issuance of a Building Permit.

(Ord. No. 2108 § 1.)

**Division 36.340. Hillside Protection**

Sections:
    36.340.010   **Purpose of Division.**
    36.340.020   **Applicability.**
    36.340.030   **Permit and Application Requirements.**
    36.340.040   Hillside Development Design Guidelines.

**36.340.050   Hillside Project Development Standards.**

**36.340.010 Purpose of Division.**

The standards of this Division are intended to:

A.   Preserve the City's scenic resources by encouraging retention of natural topographic features and vegetation;

B.   Acknowledge that as the slope of a development site increases so does the potential for environmental degradation including slope failure, increased erosion, sedimentation and stormwater run-off; and

C.   Encourage grading practices that are appropriate in hillside areas; and

D.   Encourage structures on hillside parcels to be designed with scale, massing, architectural design and detailing appropriate to maintain hillsides in a natural, open character.

(Ord. No. 2108 § 1.)

**36.340.020 Applicability.**

A.   Sloping sites. The standards in this Division apply to subdivisions, uses, structures, and to all other development on sites with an average of slope of 20 percent or greater.

B.   Exceptions. The provisions of Section 36.340.050 (Hillside Project Development Standards) shall not apply to parcels within the AM (Altos de Monterey) overlay zone, which are instead subject to the requirements of Section 36.250.030 (Altos de Monterey (AM) Overlay District).

C.   Determination of average slope. Average slope shall be determined by applying the following formula.

$$\text{Average Slope Formula: } S = \frac{100 \, (I \times L)}{A}$$

Where:

S = Average natural slope in percent.

I = Contour interval in feet, at not more than 10 foot intervals, resulting in at least five contour lines being shown on the contour map.

L = The sum of the length of all the contour lines across the parcel in scale feet. See Figure 3-25.

A = The gross area of the building site in square feet.



**Figure 3-25. Measurement of Contour Line Length to Determine "L" in Slope Formula**

D.   Guest parking spaces. Section 36.340.050H applies only to properties located on the following streets in the Southwest Monterey Hills area of the city: Hanscom Drive, Peterson Avenue, Illinois Drive, Hill Drive, Harriman Avenue, Randolph Avenue, Hulbert Avenue, Elkins Street, Moffatt Street.

(Ord. No. 2108 § 1; Ord. No. 2166 § 1, 2007.)

**36.340.030 Permit and Application Requirements.**
Development that is subject to this division shall require a Hillside Development Permit (SPMC 36.410.065) and Design Review (SPMC 36.410.040). The application shall include:

A.   Basic application contents. All information and materials required by SPMC 36.400.040 (Application Preparation and Filing), and all additional materials required by the application contents handout provided by the Department for hillside development; and

B.   Geotechnical report. A preliminary geotechnical report that identifies and proposes mitigation measures for any soils or geological problems that may affect site stability or structural integrity. Depending upon the site characteristics and project design, a final geotechnical report may also be required as part of a subsequent Building Permit application.

C.   Constraints analysis. For properties that have sensitive environmental resources including endangered plants and animals, or a wildlife corridor designated by the City, a qualified professional approved by the Director shall prepare a site constraints analysis in compliance with SPMC 36.380.030. The report shall include proposed mitigation measures to effectively protect important biological features identified.

(Ord. No. 2108 § 1; Ord. No. 2183 § 15, 2009; Ord. No. 2346 § 2 (Exh. A), 2020; Ord. 2348 § 3 (Exh. A), 2020.)

**36.340.040 Hillside Development Design Guidelines.**
Proposed hillside development should satisfy as many of the following objectives as feasible, as determined through the Design Review process.

A.   Terrain alteration. The project should be designed to fit the terrain rather than altering the terrain to fit the project. Development patterns that form visually protruding horizontal bands or steeply cut slopes for roads or lots shall be avoided. Large-scale slope terracing, cribwalls, or significant slope modification is discouraged. Where alteration of the terrain is necessary, contour grading techniques should be utilized to help achieve a natural appearing slope. (See Section 36.340.050.F and Figure 3-33.)

B.   Street layout. Any new streets should follow the natural contours of the terrain to minimize the need for grading. Cul-de-sacs and loop roads are encouraged where necessary to fit the natural topography, subject to the approval of the City Engineer and Fire Chief.

C.   Location of structures. Structures should be located in the most accessible, least visually prominent, and most geologically stable portion or portions of the site. They should also be oriented with the natural contours of the site. Siting structures in the least visually prominent locations is especially important on open hillsides where the prominence of construction should be minimized by placing structures so that they will be screened by existing vegetation, depressions in topography, or other natural features.

D.   Site layout and structure design. Building and site design should utilize varying setbacks and structure heights, split-level foundations, and low retaining walls to blend structures into the terrain.

E.   Architectural design.

1.   Form. Building forms should complement the character of the hillsides and avoid massive structures that dominate views of the hills.

2.   Scale and windows—Infill lots. The scale of homes proposed on infill lots should be compatible with buildings on adjacent parcels. Where feasible, windows, balconies, and outdoor living areas should be located to protect the privacy of adjacent homes and yards.

3.   Exterior wall surfaces. The apparent size of exterior wall surfaces visible from off the site should be minimized through the use of single story elements, setbacks, overhangs, roof pitches, landscaping, and/or other means of horizontal and vertical articulation to create changing shadow lines and break up massive forms.

4.   Roofs. Roof pitches should generally be placed to follow the angle of the slope; but with variations to avoid a monotonous appearance. See Figure 3-26.



Figure 3-26. Design Sensitive to Terrain

Note: This diagram is intended to provide an example of building form,
and is not intended to show a preferred architectural style.

5.   Support structures. Support structures (for example, columns, pilings, etc.) below the lowest floor on the downhill side of a house, should be enclosed unless visible structural members are an

integral feature of the architectural design. Support structure wall surfaces shall not exceed six feet in height.

F.   View protection. New construction should not block views from other properties.

   1.   Where feasible, new structures and tall landscaping should not be placed directly in the view of the primary living areas on a neighboring parcel.

   2.   New structures should be placed on the lower areas of a hillside site.

   3.   Mechanical equipment may be placed on rooftops or below a deck only if the equipment is not visible from off the site, except for unobtrusive solar collectors that are compatible with the roof line and architecturally integrated with the structure.



**Figure 3-27. View Protection**

G.   Colors and materials. A mixture of materials, color, and forms should be used to blend structures with the natural appearance of the hillsides:

   1.   Based upon the graphic principle that dark colors are less noticeable than light colors, darker tones, including earth tones should be used for building walls and roofs on highly visible sites so that buildings appear to blend in with the natural terrain.

   2.   Surface materials should be appropriate for the architectural style of the structure and compatible with the hillside environment.

H.   Exterior lighting. Night views of the hillsides should not be dominated by bright lights. Lighting within high-visibility areas should be properly shielded to avoid glare and the spill of light to surrounding areas. Low-level lighting and the use of multiple low profile fixtures is encouraged, as opposed to the use of fewer, but taller fixtures.

I.   Retaining walls. Large retaining walls in a uniform plane shall be avoided. Retaining walls shall be divided into terraces with variations in plane and include landscaping to break up the length of walls and to screen them from view. No retaining wall shall be higher than six feet, and should incorporate a three-foot recessed offset feature every 30 feet, or other methods of articulation. Retaining walls more than three feet high that are visible from off the site should be screened with landscaping. See Figure 3-28.

2/9/22, 10:30 AM                                    Article 3 Site Planning and General Development Standards



**Figure 3-28. Retaining Wall Design**

(Ord. No. 2108 § 1.)

**36.340.050 Hillside Project Development Standards.**

A.   Setbacks. Hillside developments shall comply with the following setback requirements, and with the limitations on the allowable uses of setbacks in SPMC 36.300.030(E)(3).

| TABLE 3-10. HILLSIDE SETBACKS | |
|---|---|
| Property Setback | Setback Distance |
| Front | 10 ft. |
| Side | 10 percent of width, minimum 4 ft., maximum 10 ft. |
| Corner Side | 10 percent of width, minimum 10 ft., maximum 15 ft. |
| Ridgeline (1) | 50 vertical ft. from ridgeline. Also see SPMC 36.340.050(C), and Figure 3-31. |
| Notes: | |
| (1) New structures or additions are prohibited within 50 feet of a ridgeline unless this restriction precludes development of the property. An exception may be granted if the review authority finds the following:<br>    a. There are no site development alternatives that avoid ridgeline development;<br>    b. The density has been reduced to the minimum standards consistent with the General Plan density range;<br>    c. No new subdivision of parcels is created that will result in ridgeline development; and<br>    d. The proposed development will not have significant adverse visual impacts due to modifications in structural design including height, bulk, size, foundation, siting, and landscaping that avoid or minimize the visual impacts of the development. | |

B.   Setbacks between structures and toes/tops of slopes. On adjacent lots having a difference in vertical elevation of three feet or more, the required side yard shall be measured from the nearest toe or top of slope to the structure, whichever is closer. See Figure 3-29.



**Figure 3-29. Side Setback Measurement**

C.   Height limitations. The maximum height for structures with a roof pitch of 3:12 or greater shall be 28 feet. If a roof pitch is less than 3:12, the maximum height shall be 24 feet.

1.   Siting restrictions. Structures shall not be placed so that they appear silhouetted against the sky when viewed from a public street, except where the review authority determines that the only feasible building site cannot comply with this standard. See Figure 3-30.



**Figure 3-30. Silhouetted Structures**

2.   Placement below ridgeline. Except as provided by subsection (C)(3) of this section, structures shall be located so that a vertical separation of at least 50 feet is provided between the top of the structure and the top of the ridge or knoll to maintain the natural appearance of the ridge. Grading should also be avoided within 50 vertical feet of the top of a ridge or knoll. Placement of structures should also take advantage of existing vegetation for screening, and should include the installation of additional native plant materials to augment existing vegetation, where appropriate. See Figure 3-31.



**Figure 3-31. Location of Structures Below Ridgelines**

3.  Height limit above ridgeline. Where the review authority determines that a parcel contains no feasible building site other than where a structure will extend above the ridgeline, proposed structures shall not exceed a height of 16 feet above the highest point on the ridgeline or hilltop within 100 feet of the proposed structure.

4.  Height of lowest floor level. The vertical distance between the lowest point where the foundation meets grade and the lowest floor line of the structure shall not exceed six feet.

5.  Downhill building walls. No single building wall on the downhill side of a house shall exceed 15 feet in height above grade. Additional building height on a downhill side may be allowed in 15-foot increments, where each increment is stepped back from the lower wall a minimum of 10 feet (see Figure 3-32).



**Figure 3-32. Height Limit for Downhill Building Walls**

D.  Decks. No portion of the walking surface of a deck with visible underpinnings shall exceed a height of six feet above grade. Decks should be integrated into the architecture of the house, not appearing as an "add-on" to the primary building mass.

E.  Driveways. The ramp to any garage or carport shall not have a grade steeper than five percent within 10 feet of the garage or carport entry. The finished grade of driveways shall not exceed an average of 15 percent.

F.  Natural state. A minimum of 25 percent of the lot area plus the percentage figure of the average slope must be remediated to its natural state in terms of slope and vegetation.

G.  Grading. Grading plans shall be prepared in compliance with the Municipal Code and the General Plan. Grading on slopes over 30 percent shall be permitted when sufficient technical information has been provided to support the determination that such development would have no negative impacts on the subject property, adjacent properties, or on the safety and welfare of the public. Grading shall utilize landform grading techniques. See Figure 3-33.



**Figure 3-33. Appropriate Grading**

H.    Southwest Monterey Hills guest parking spaces. The following guest parking space standards apply only to hillside properties (as defined in SPMC 36.340.020(A)) in the Southwest Monterey Hills area as defined by SPMC 36.340.020(D).

1.    Required off-street guest parking spaces shall be provided in accordance with SPMC 36.310.040, Table 3-6 (Parking Requirements by Land Use). An application for a new house, or addition to an existing house that lacks the required off-street parking, shall provide details on the location and dimensions of required guest parking space(s), which shall be located perpendicular (or as close as possible to 90 degrees) to the right-of-way, and within or partially within the required front setback. If physical constraints preclude this location, the applicant shall provide written documentation of these constraints and provide the required off-street guest parking in the following order of preference:

a.    Parallel to the street and at least 10 feet wide by 24 feet deep. Access to a parallel parking space shall not be impeded by landscaping, trees, retaining walls, fences, the alignment of the right-of-way, or any other obstacle. Clear access shall be permanently retained; or

b.    Other locations as approved by the Director. (The onus is placed on the applicant to demonstrate to the satisfaction of the Director that such a location will be functional and allow vehicles to be parked with no portion encroaching into the right-of-way.)

2.    Paving limits. Front yard paving limits as listed in SPMC 36.300.030(E)(3)(c) (Setback Measurement and Exceptions) shall be observed, except when the required guest parking space(s) can only be located in the front yard.

3.    Slope. The slope of uncovered parking space(s) shall comply with the standards in SPMC 36.310.080(G)(2) (Parking Design Standards) and 36.340.050(E) (Hillside Project Development Standards).

4.    Dimensions. Uncovered perpendicular spaces shall be at least nine feet wide by 18 feet deep. Uncovered parallel spaces shall be at least 10 feet wide by 24 feet deep.

5.    Allowable materials. Parking space materials shall conform to the standards listed in SPMC 36.310.090(C)(2) (Driveways and Site Access).

(Ord. No. 2108 § 1; Ord. No. 2166, 2007; Ord. No. 2346 § 2 (Exh. A), 2020; Ord. No. 2348 § 3 (Exh. A), 2020.)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
# EXHIBIT 5
21
22
23
24
25
26
27
28

Complaint for Declaratory & Injunctive Relief based on 42 USC 1983 & 42 USC 1985

prior to the scheduled action date. The notice shall state that the Director will take action on the requested Administrative Use Permit if no public hearing request is received within 10 calendar days from the postage date on the notice. The notice shall include the phone number and street address of the Department where an interested person could call or visit to obtain additional information;

iii.  Environmental Review. A statement explaining compliance with California Environmental Quality Act.

F.  Findings and decision. The Commission or Director, as applicable, may approve, conditionally approve, or disapprove an application for a Conditional Use Permit or Administrative Use Permit, and shall record the decision and the findings upon which the decision is based. The review authority may approve the permit only after first making all of the following findings, and any additional findings required for the approval of specific land uses by Division 36.350 (Standards for Specific Land Uses).

1.  The proposed use is allowed with Conditional Use Permit or Administrative Use Permit approval within the applicable zoning district and complies with all applicable provisions of this Zoning Code;

2.  The proposed use is consistent with the General Plan and any applicable specific plan;

3.  The establishment, maintenance, or operation of the use would not, under the circumstances of the particular case, be detrimental to the health, safety, or general welfare of persons residing or working in the neighborhood of the proposed use;

4.  The use, as described and conditionally approved, would not be detrimental or injurious to property and improvements in the neighborhood or to the general welfare of the City;

5.  The subject site is adequate in terms of size, shape, topography, and circumstances and has sufficient access to streets and highways which are adequate in width and pavement type to carry the quantity and quality of traffic expected to be generated by the proposed use; and

6.  The design, location, operating characteristics, and size of the proposed use would be compatible with the existing and future land uses in the vicinity, in terms of aesthetics, character, scale, impacts on neighboring properties.

G.  Conditions of approval. In approving a Conditional Use Permit or Administrative Use Permit, the review authority may impose conditions deemed reasonable and necessary to ensure that the approval would be in compliance with the findings required by subsection (F) (Findings and decision) of this section and to preserve the public health, safety, and general welfare.

(Ord. No. 2108 § 1; Ord. No. 2346 § 2 (Exh. A), 2020; Ord. No. 2348 § 3 (Exh. A), 2020.)

 **36.410.065 Hillside Development Permits.**

A.  Purpose. Hillside Development Permits provide a review process for the City to consider the appropriateness of proposed development on hillside parcels, to ensure that proposed projects minimize their visual and environmental impacts.

B.  Applicability.

1.  A Hillside Development Permit is required to authorize any proposed construction of new primary dwelling unit that is subject to the requirements of Division 36.340 (Hillside Protection).

2.  A Minor Hillside Development Permit is required to authorize any other proposed development that is subject to the requirements of Division 36.340 (Hillside Protection).

C.  Application filing and processing.

1.  A Preliminary Review application under SPMC 36.410.040(E) (Preliminary Review) and an application under Division 36.400 (Application Filing and Processing) are required for a Hillside Development Permit or Minor Hillside Development Permit.

D.  Review authority.

1.  Hillside Development Permits may be approved or disapproved by the Planning Commission.

2.  Minor Hillside Development Permits may be approved or disapproved by the Design Review Board (DRB), DRB Chair, or Planning Director in accordance with SPMC 36.410.040.

E.  Project review, notice, and hearing.

1.  Each application shall be analyzed by the Director to ensure that the application is consistent with the purpose and intent of this section. The Director shall submit a staff report and recommendation to the Commission for their consideration of a Hillside Development Permit.

2.  The Commission shall conduct a public hearing on an application for a Hillside Development Permit prior to the approval or disapproval of the permit.

3.  Notice of the public hearing shall be provided, and the hearing shall be conducted in compliance with Division 36.630 (Public Hearings).

F.  Findings and decision. The review authority may approve the permit only after first finding that:

1.  The proposed use complies with the requirements of Division 36.340 (Hillside Protection) and all other applicable provisions of this Zoning Code.

2.  The proposed use is consistent with the General Plan and any applicable specific plan;

3.  The establishment, maintenance, or operation of the use would not, under the circumstances of the particular case, be detrimental to the health, safety, or general welfare of persons residing or working in the neighborhood of the proposed use;

4.  The use, as described and conditionally approved, would not be detrimental or injurious to property and improvements in the neighborhood or to the general welfare of the City; and

5.  The design, location, operating characteristics, and size of the proposed use would be compatible with the existing and future land uses in the vicinity, in terms of aesthetics, character, scale, and view protection.

G.  Conditions of approval. In approving a Hillside Development Permit or Minor Hillside Development Permit, the review authority may impose conditions deemed reasonable and necessary to ensure that the approval would be in compliance with the findings required by subsection (F) of this section, and to preserve the public health, safety, and general welfare.

(Ord. No. 2108 § 1; Ord. No. 2346 § 2 (Exh. A), 2020; Ord. No. 2348 § 3 (Exh. A), 2020.)

**36.410.070 Administrative Modifications.**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
# EXHIBIT 6
20
21
22
23
24
25
26
27
28

Complaint for Declaratory & Injunctive Relief based on 42 USC 1983 & 42 USC 1985

## 2.5G  Hillside Development

**GOAL 19:**  **To ensure that new development within hillside areas of South Pasadena does not adversely impact the character of the city.  (see also, Goal 6, pg. VII-18)**

*Policies:*

19.1:  **Regulate all hillside development.**  Closely monitor all hillside development, paying particular attention to properties exceeding five acres; require design review of all projects.

19.2:  **Maintain and enhance zoning standards for hillside development.**  Create zoning standards which will control residential development in sensitive areas; compute hillside densities using "net" rather than total acreage.  For purpose of this general plan, "net" density refers to that land remaining for development after all development constraints, extreme slopes, significant ecological areas, and hazards have been deducted from total acreage.  For the purpose of this policy, "constraints" shall be defined to include:

- Significant topographic, geographic, geologic and hydrologic features such as ridgelines, knolls, fault lines, liquefaction zones, and other similar features determined by the Community Development Department to be important to the physical and environmental character of the property.

- Significant environmental areas and features of the site including but not limited to riparian habitat, significant ecological areas, slopes exceeding 30%, fault zones including Alquist-Priolo Special Studies Zones; drip lines of significant and heritage trees as defined by City ordinance.

- Fuel modification zones required by City ordinance.

- Subsurface or surface utility easements and right-of-way not held by the responsible agency to be suitable for construction of residential structure.

19.3:  **Augment existing grading standards.**  Maintain hillside development standards that eliminate the negative visual effects of grading, require the preservation of unique natural features, and encourage a range of architectural and site planning responses.

19.4:  **Require adequate mitigation on all projects.**  Ensure that all hillside development blends with its surroundings by reducing building heights and massing, and by incorporating natural materials and native landscaping into project designs.

19.5:  **Discourage over-development.**  Discourage over-development and prohibit oversized projects on large parcels of unimproved and/open space on hillsides.

19.6:    **Prohibit grading of ridgelines.** Prohibit grading on any type of feature that would be considered a ridge, which includes but is not limited to knolls, ridgetops or saddles.

19.7:    **Discourage Hillside Grading.** Discourage hillside grading which damages the integrity of hillside areas in order to create views.

19.8:    **Establish slope/density restrictions.** Establish clear slope/density restrictions to implement plan objectives; effectuate standards by ordinance.

19.9:    **Prohibit grading of slopes in excess of 30%.**

---

**GOAL 20:**    **To ensure that the development of hillside areas in adjacent Los Angeles is compatible with that in South Pasadena and has adequate utilities and public services.**

---

*Policies:*

20.1:    **Establish a natural buffer between communities.** Establish a natural buffer zone between the two communities if feasible.

20.2:    **Promote General Plan compatibility.** Work with the City of Los Angeles to ensure that land-use proposals within its hillside sphere are consistent with or compatible with the policies of this General Plan.

20.3:    **Encourage annexation for service extensions.** Encourage annexations as a condition of the extension of City utilities and public services.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT 7

Complaint for Declaratory & Injunctive Relief based on 42 USC 1983 & 42 USC 1985









1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT 8

Complaint for Declaratory & Injunctive Relief based on 42 USC 1983 & 42 USC 1985

↩ Reply all  ⌄    🗑 Delete    ⊘ Junk    Block sender    ⋯

## RE: Planning files custody and meeting request

ⓘ    You forwarded this message on Wed 3/16/2022 11:46 AM

EZ    **Evelyn Zneimer** <ezneimer@southpasadenaca.gov>    👍 ↩ ↩ → ⋯
Mon 2/21/2022 11:45 PM
To: James RE Cheung; Evelyn Zneimer <ezneimer@southpasadenaca.gov>

Mr. Cheung,

I referred your case to staff specifically, Director of Planning, Angelica Frausto-Lupo, because this is staff matter and anyone requesting to view copyrighted and protected intellectual property documents must follow protocol - file a public request.  You should know this because you are a developer. And whatever building permit that was previously and lawfully granted by Staff cannot be changed.

I have met with you twice and so did Director Frausto-Lupo and Planning Manager, Matt Chang.  However, you can contact Director Frausto-Lupo directly at (626) 403-7222 and she will be glad to meet with you again.

Sincerely,

Councilmember Zneimer

Sent from my T-Mobile 4G LTE Device

-------- Original message --------
From: James RE Cheung <James@agiohome.com>
Date: 2/17/22 11:47 AM (GMT-08:00)
To: Evelyn Zneimer <ezneimer@southpasadenaca.gov>
Cc: Matt Chang <mchang@southpasadenaca.gov>, Angelica Frausto-Lupo <afraustolupo@southpasadenaca.gov>, City Manager's Office <cmoffice@southpasadenaca.gov>
Subject: FW: Planning files custody and meeting request

CAUTION: This email originated from outside of the City of South Pasadena. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Good day councilmember Zneimer,
I am seeking your assistance in this issue.  Here are the sequence of events

1. On Wednesday, 02/09, I had a virtual meeting with Planning department regarding the project at 1627 Via Del Rey.  I would like to review the design and plan which are copy righted and cannot be sent out. The only way  to review them would be coming to the City.  I made an appointment to review them on Monday 02/14 at 1pm.